# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE

Assigned on Briefs December 7, 2011

### STATE OF TENNESSEE v. KEVIN D. BUFORD

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-B-1355     Randall L. Wyatt, Jr., Judge**

_____

**No. M2010-02160-CCA-R3-CD - Filed December 28, 2011**

_____

A Davidson County jury convicted the Defendant, Kevin D. Buford, of felony murder and attempted especially aggravated robbery. The trial court imposed concurrent sentences of life for the felony murder conviction and ten years for the attempted especially aggravated robbery conviction. On appeal, the Defendant asserts that there is insufficient evidence to support his convictions. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right ; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

Jeremy W. Parham, Nashville, Tennessee, for the appellant, Kevin D. Buford.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Kathy Morante and Amy H. Eisenbeck, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

A Davidson County Grand jury indicted the Defendant for felony murder and attempted especially aggravated robbery for his participation in the robbery and murder of Billy Jack Shane Tuders. At a trial on these charges, the parties presented the following evidence: Janice Tuders, the victim's mother, testified that her son was thirty-three years old and the father of two children at the time of his death. Tuders connected her son to

the location of the murder in this case by saying that he worked at a Jiffy Lube which was connected to a car wash on Clarksville Pike. Tuders recalled that the victim was paid in cash and normally made seventy dollars a day. She said the victim often went to the gas station market near his work to purchase items, and, "every once and awhile," he purchased lottery tickets. Tuders recalled that, in the winter months, the victim wore a toboggan cap.

Eric Richardson, a Metropolitan Nashville Police Department officer, testified that on January 21, 2008, he responded to a crime scene at a gas station on Clarksville Pike. Upon arrival, Officer Richardson found police officers attending to the victim on the back side of the car wash, so he began to survey the area to determine the parameters of the crime scene. In the front parking lot area, between the gas station and the car wash, Officer Richardson found a spent shell casing and "some money."

Norris Tarkington, a Metropolitan Nashville Police Department detective, testified that he reported to the scene of a murder on January 21, 2008, on Clarksville Pike. There, Detective Tarkington observed a nine-millimeter shell casing near the front door to the car wash. He also observed a twenty dollar bill and, sitting on top of the twenty dollar bill "as if to keep it from blowing in the wind," a lottery ticket and blood drops. A black toboggan cap was also found behind the Jiffy Lube located next door to the car wash.

Donna Jones testified that she and her son, Donnell Jones, were at the grocery store located on Clarksville Pike across the street from a car wash and gas station at around 5:00 p.m. or 6:00 p.m. on January 21, 2008. As they were exiting the grocery store, she heard "at least three" gunshots, so she and her son ran back into the store. She believed the gunshots came from the car wash located across the street from the grocery store. Ms. Jones watched three black men run from the car wash toward the grocery store and get into a "white SUV-type truck." She described two of the men as "younger," and she said all three men were laughing like "something was funny." Later, Ms. Jones viewed photographic line-ups of suspects but was unable to identify any of the three men.

Donnell Jones testified that, on January 21, 2008, he was at the grocery store on Clarksville Pike with his mother. As they were exiting the store, he heard gunshots coming from across the street, so he and his mother went back into the grocery store. Jones saw three black men running across the street toward the grocery store parking lot. As the SUV drove away, Jones wrote down the license plate number from the SUV, and he later provided the number to police. Jones said that he also identified two of the men in a police photographic line-up.

Harold Haney, a Metropolitan Nashville Police Department detective, testified that

2

he obtained surveillance video of a shooting/homicide that occurred on Clarksville Pike. The State played the video for the jury, and it showed one person who appeared to point an object at an individual in front of him after which two people run away. On cross-examination, Detective Haney agreed that other individuals seen on the surveillance footage have not been identified.

Robert Hanson, a Metropolitan Nashville Police Department detective, testified that he prepared photographic line-ups that included the Defendant and a co-defendant. Detective Hanson showed the line-ups to Ms. Jones and her son separately. Ms. Jones was unable to make an identification of the men she observed running away from the car wash. Donnell Jones, however, identified the Defendant.

Raymond Pirtle, a co-defendant in this case, testified that he was a juvenile at the time these crimes were committed. Pirtle said that he met the Defendant, whom he described as a "friend[]," in school several years before the shooting. Pirtle testified that he owned a nine-millimeter Smith and Wesson, which he loaned to the Defendant three weeks before this shooting. Pirtle said that the gun was loaded at the time he gave it to the Defendant.

Pirtle testified that on January 21, 2008, the Defendant appeared at Pirtle's front door and invited Pirtle "to do a robbery" with him, his father, "Kevin Sr." and his brother, Deangelo Buford. Pirtle agreed and got into the car with the Defendant, Kevin Sr., and Deangelo Buford. They drove to a Burger King on Gallatin Road and parked. Kevin Sr., who had been driving, asked Pirtle if he knew "how to do a robbery" and Pirtle told him that he did. Kevin Sr. then told them, "Well, a friend of mine told me about this car lot that's supposed to have some drugs and some money in there. They ain't got no guns, so it should be easy to go in there and get it." Pirtle said that he, the Defendant and Deangelo Buford, who had the gun, got out of the car and walked toward the car lot. As they walked, they decided "it wasn't good for us," so they returned to the car. After returning to the car, Kevin, Sr. asked what happened, and the boys responded, "They didn't let us in." Kevin Sr. insisted the boys try again, but this second attempt was also unsuccessful.

Pirtle testified that, next, Kevin Sr. drove to an Auto Zone and told the boys to wait in the car while he checked for surveillance cameras. The Defendant's father returned to the car, made a brief phone call and then Pirtle arranged to buy some marijuana from [Edwards]. After buying the marijuana, the group then went downtown to pick up the Defendant's uncle, Robert Buford, from work. After picking up Robert Buford, Kevin Sr. went to a liquor store and said, "Y'all stay in the car; fixing to go in here and get some liquor, so [ ] it'll look like we drinking." After buying liquor, the

3

Defendant's father instructed Pirtle to arrange to buy a "quarter bag [of] weed," Pirtle arranged to meet "Edwards" to buy more marijuana. Once they arrived at the agreed upon location, Pirtle learned that Kevin Sr. intended to rob "Edwards." Robert Buford was outside the car when "Edwards" approached and began talking with Pirtle. Robert Buford asked "Edwards" for a cigarette and, when "Edwards" reached in his pocket, "Robert Buford robbed him." Kevin Sr. drove off, leaving Robert Buford behind, but he later picked up Robert Buford in another location.

Pirtle testified that, after robbing "Edwards," the men drove down Clarksville Pike, and Kevin Sr. said, "Y'all got fifteen minutes to do a robbery, because I gotta go pick up my wife from work." The Defendant's father pulled into a car wash, and the victim walked by the group, counting some money. Kevin Sr. said, "He got some money." Pirtle described the Defendant as "a little hyper" because they had been drinking and smoking all day. Robert Buford handed the Defendant the gun, and the two got out of the car. Kevin Sr. drove the car across the street and parked in a grocery store parking lot. Pirtle said that, after Kevin Sr. parked, he got out of the car and went across the street "to help." Pirtle saw the victim punch the Defendant and the two "got into a little fight and the gun went off." The Defendant, Robert Buford, and Pirtle then ran across the street back to the car. Pirtle said that the Defendant's father never threatened Deangelo Buford or the Defendant into committing the robberies that day.

On cross-examination, Pirtle agreed that the Defendant's father was "calling the shots." Pirtle agreed that they did not complete the robbery at the car lot because he, the Defendant and Deangelo Buford were "scared." When they did not complete this robbery, Pirtle described the Defendant's father as not happy and "a little bit" frustrated with the three boys.

Chris Steele, a Metropolitan Nashville Police Department officer, testified that, based upon the vehicle description and license plate provided by the Joneses, he was able to determine that the vehicle belonged to Kevin Sr.. Kevin Sr. initially claimed that only his son, Deangelo Buford, was in the car with him that day but later named the Defendant as his son too. Based upon this information, police officers located Deangelo Buford and the Defendant and transported them to the police station.

Sergeant Steele testified that he interviewed the Defendant, and a video recording of that interview was played for the jury. Initially in the interview, the Defendant denied any knowledge of the shooting or robbery. The Defendant said that at 6:00 p.m. he was at his house. As the detectives revealed details of their investigation, the Defendant continued to deny any knowledge of the events. He acknowledged that he rode on Clarksville Highway with his brother and father but said that he could not remember at

4

what time of day. The Defendant denied going to the car wash and said that he was in a store instead.

During the interview, the Defendant told police he was sixteen years old. After police warned him that he could potentially be charged with these crimes as an adult, the Defendant admitted that he, Pirtle and "some other dude" were at the car wash. The Defendant told the police officers that Pirtle identified the victim as having "some money," and the Defendant "tried to rob him." The Defendant described the robbery, saying that the victim turned around and hit him. When the victim hit the Defendant, the gun went off, after which the Defendant and Pirtle ran across the street. The Defendant described the gun as silver and told the police officers that he gave the gun to Pirtle after the robbery.

The Defendant said that, before the shooting, he was at a park on King's Lane and that he and Pirtle walked to the car wash from the park. The Defendant denied that he and Pirtle ever discussed robbing someone. The Defendant said that his father and brother were not present during the robbery but later came to the location to pick him up. The Defendant told the police officers that his father's wife, and not his father, was driving the SUV. The Defendant maintained that his father knew nothing of the robbery, explaining that he called his father and asked him to pick him up because the Defendant was locked out of his house.

Based upon the Defendant's references to "Little Ray" during the interview, police officers located Raymond Pirtle and interviewed him as well. Pirtle confirmed the information police officers already knew regarding the course of events.

On cross-examination, Sergeant Steele agreed that the gun used during the shooting was never found. Sergeant Steele said that there were no additional safeguards for juveniles during interrogations. The Defendant was sixteen at the time of the interrogation, and, at that age, deemed old enough to read and understand *Miranda* rights. Sergeant Steele said the Defendant was in bed asleep when police officers retrieved him from his home for questioning, and the Defendant did not show any signs of impairment. Sergeant Steele testified that, based upon his investigation, only one shot was fired during this incident.

Sandra Parrish Thomas, an Assistant Medical Examiner, testified as an expert witness in the field of forensic pathology. Dr. Thomas testified that she did not perform the autopsy on the victim's body, however, she had reviewed the report, notes, and photographs of the victim's autopsy and agreed with the determinations in the autopsy report. The victim suffered a single gunshot wound, and the bullet had entered in the area

5

of his left shoulder blade on his back and exited the left side of the front of the victim's chest. Dr. Thomas testified that the cause of death was a single gunshot wound and the manner of death was homicide.

The Defendant testified that he had not met his father until six months before the robbery and shooting. His mother discouraged any contact between the two, but the Defendant wanted to know his father. The Defendant said meeting his father was "the most important thing" to him. The Defendant said that he "asked around" about his father and, one day, his father called him on his cellular phone. The Defendant explained that his father was not allowed to come to his home, so he would sneak out of his house and meet his father down the street. At first, the two played video games and did "father and son things." After a few months, the Defendant's father lost his job, and the Defendant noticed a difference in his father. The Defendant said that his father began drinking and using drugs.

The Defendant testified that he was friends with Raymond Pirtle and knew that Pirtle had a gun. One day Pirtle left his gun with the Defendant at the Defendant's house. The Defendant said he "put [the gun] up" and then called his father and told him about the gun. Several days later, the Defendant's father came to get the gun. The two met down the street, per their usual routine, and the Defendant gave Pirtle's gun to his father. The next time the Defendant saw his father was the day of these crimes.

The Defendant recalled that, on January 21, 2008, the Defendant was at his aunt's home in Madison, Tennessee, when his father called him. The Defendant and the Defendant's brother met their father at 8:00 a.m. or 9:00 a.m. The Defendant said they ran errands, got their haircut, and ate lunch. At one point, the Defendant's father began asking questions about who gave the Defendant the gun. The Defendant told his father that Pirtle gave him the gun and his father suggested they contact Pirtle to help with a robbery. The Defendant told his father that he did not "know how to do no robbery," but his father said he would show the Defendant.

The Defendant testified that he went to Pirtle's home and invited Pirtle to join them, and Pirtle agreed. The Defendant said that his father, who was forty-two years old, drove the three boys around. Deangelo Buford, who was seventeen at the time, sat in the passenger seat while the Defendant, who was sixteen, and Pirtle, who was seventeen years old, sat in the back seat. The Defendant's father drove to Madison and parked in a fast food restaurant parking lot located next to a car lot. The Defendant's father then told the three boys how they were going to accomplish the robbery of the car lot. The Defendant said that the three boys got out of the car, walked up to the building on the car lot where they were supposed to go and kept walking. The Defendant said they were

6

scared, so they "made up a story" to tell his father and returned to the car. The Defendant said that his father did not say much, but he could tell that his father was mad that they had not completed the robbery.

The Defendant testified that they then went next door to an Auto Zone. The Defendant's father went inside the Auto Zone and, when he realized "we couldn't rob it," he came back out and they left. The Defendant said that he was "relieved" when they drove away from the Auto Zone. The Defendant described his father as "mad" and "frustrated." Next, Pirtle bought marijuana from "Edwards," and the Defendant's father rolled up several joints and they all smoked. The Defendant recalled that his father was driving "past downtown" when they saw Robert Buford, his father's brother. The Defendant estimated that Robert Buford was thirty-nine. Robert Buford joined the men, and they drove to a liquor store on Jefferson Street, where the Defendant's father bought liquor. When the Defendant's father returned to the car, he wanted Pirtle to rob someone but changed his mind because there were "too many people in the store." The Defendant's father bought three little bottles of "clear liquor" and everyone in the car drank some of it. The Defendant said that he did not know how much he drank that day and said it was the first time he had consumed alcohol.

The Defendant testified that Pirtle called "Edwards" and arranged to meet him at a store to buy more marijuana. When "Edwards" arrived, he walked over to their car, and Robert Buford robbed "Edwards" with Pirtle's gun. The Defendant said that he believed they were buying marijuana and did not know Robert Buford was going to rob "Edwards" until it happened. The Defendant said that, when this happened, he was confused and "didn't understand why they did it."

After robbing "Edwards," the Defendant's father drove to a car wash on Clarksville Pike where they saw the victim. The Defendant's father said the victim had money and instructed the Defendant to rob the victim. The Defendant's father sent Robert Buford with him "to make sure." As the Defendant was getting out of the car, Robert Buford handed him the gun, and they walked toward the victim. The Defendant said that he told the victim, "Come on with it," and the victim turned and hit the Defendant. The Defendant said he did not know what to do, and he heard Robert Buford say, "Shoot'im. Shoot'im," so he shot the victim. The Defendant said that he fired the gun once and then ran toward the car. Once back in the car "everybody was telling [the Defendant] [he] was stupid." The Defendant's father told everyone in the car, "if we mention his name, then we know what it is." The Defendant interpreted this statement as a threat. The Defendant said that he placed the gun under his father's seat in the car.

The Defendant testified that his father took him and his brother home. Once at

home, the Defendant recalled that he was "scared" and "crying and stuff" but eventually went to sleep. At approximately 2:00 a.m., police officers woke him and took him to the police station for questioning. The Defendant said that most of his statement to the police was a lie, because his father told him not to mention his name. The Defendant said he tried to "protect" his father because "he my family and, if I mention his name, then he could easily get to me."

The Defendant agreed that he previously pled guilty in this case and, as part of the plea, made a proffer of evidence. The Defendant confirmed that his proffer at the guilty plea hearing was truthful. Subsequently the Defendant withdrew his guilty plea because he believed his attorney at that time misadvised him.

On cross-examination, the Defendant agreed that the State's offer was that he would plead guilty to second-degree murder in exchange for testifying at his father's trial. A week or two before his father's trial, the Defendant said that he wanted to withdraw his plea, and he did not testify at his father's trial.

Trixie Williams, the Defendant's mother, testified that, about six months before this incident, the Defendant expressed a desire to know his father. Williams said she did not approve of her son meeting his father, because his father was an "abusive person." Williams said that the Defendant made contact with his father against her wishes.

Based upon this evidence, the jury convicted the Defendant of felony murder and attempted especially aggravated robbery. The trial court ordered the Defendant to serve a life sentence for the felony murder conviction and to serve ten years for the attempted especially aggravated robbery. The trial court ordered the two sentences to run concurrently to one another. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant argues that the evidence presented at trial is insufficient to support a finding that he is guilty of the underlying felony of attempted especially aggravated robbery. He contends that he was manipulated by his father, and, thus, the proof does not support that he acted intentionally or knowing with respect to the attempted especially aggravated robbery, and subsequent murder of the victim. The State responds that the proof in this case does not support a duress claim and does support the jury's finding that the Defendant acted intentionally or knowingly.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the

8

State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *See also Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### A. Attempted Especially Aggravated Robbery

The Defendant was convicted of attempted especially aggravated robbery. Especially aggravated robbery is "the intentional or knowing theft of property from the

person of another by violence or putting the person in fear" where the defendant uses a deadly weapon and causes seriously bodily injury to the victim. T.C.A. §§ 39-13-401(a), -403(a) (2010). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3) (2010). Therefore, criminal attempt requires two material elements: (1) the culpability required for the attempted crime; and (2) an act in furtherance of the attempted crime. *Wyatt v. State*, 24 S.W.3d 319, 323 (Tenn. 2000).

The evidence considered in the light most favorable to the State proved that the Defendant's father told him to rob the victim, who walked by the men while he was counting money. The victim took the gun, got out of the vehicle and approached the victim demanding money. When the victim resisted, the Defendant shot the victim and fled.

This evidence proves that the Defendant, armed with a weapon, attempted to take the victim's money and, in the course of so doing, shot and killed the victim. Accordingly, we conclude that the evidence is sufficient to support the jury's finding that the Defendant was guilty beyond a reasonable doubt of attempted especially aggravated robbery.

The Defendant concedes that he "fired the shot that resulted" in the victim's death. He argues, however, that there was insufficient evidence that he had the requisite *mens rea* for this offense because "his will . . . was overcome by the actions and demands of his father." The Defendant testified in this case and provided the jury with his account of the events of the day. Defense counsel did an excellent job in presenting the complexities of the Defendant's relationship with his father and the influence of the father on the Defendant at the time of these crimes. It is the jury who is charged with making credibility determinations, not this Court. *State v. Smith*, 24 S.W.3d 274, 278 (Tenn. 2000). It is not the function of this court to reweigh the credibility of witnesses on appeal. *Id*. at 278-79. There was sufficient evidence to support a jury finding that the Defendant acted intentionally or knowingly. The jury, based upon the verdict, did not accredit the defense theory that the Defendant's "will . . . was overcome by the actions and demands of his father." We will not disturb their decision. The Defendant is not entitled to relief as to this issue.

**B. Felony Murder**

10

In this case, the Defendant was convicted of first degree felony murder in the perpetration of an attempted especially aggravated robbery. This requires proof beyond a reasonable doubt that the Defendant killed the victim during an attempt to perpetrate an especially aggravated robbery. *See* T.C.A. § 39-13-202 (2010). The mental state required for the conviction was that the Defendant possessed the intent to commit the underlying offense, which in this case was the attempt to commit robbery.

The evidence, considered in the light most favorable to the State, proves that the Defendant approached the victim, who had been counting money, with a gun. The Defendant demanded that the victim give him the money. The victim hit the Defendant and the Defendant fired one shot at the victim which killed him.

This evidence showed that, during the course of an attempted robbery, the Defendant shot and killed the victim. Accordingly, we conclude that the evidence is sufficient to support the jury's finding that the Defendant was guilty beyond a reasonable doubt of first degree murder in the perpetration of an attempted especially aggravated robbery. As such, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE